**WELDON v. UNITED STATES et al.**

**No. 313.**

District Court, D. Massachusetts.

Nov. 5, 1934.

Francis J. Carney, of Boston, Mass., for libelant.

Francis. J. W. Ford, U. S. Atty., and Charles W. Bartlett, Asst. U. S. Atty., both of Boston, Mass., and Myron H. Avery, Legal Department, United States Shipping Board, of Washington, D. C., for respondents.

John E. Macy, of Boston, Mass., for B. A. Carroll Stevedoring Co.

BREWSTER, District Judge.

This libel as amended is by the employer of Joseph Weldon, a stevedore, who has received compensation under the Longshoremen's and Harbor Workers' Compensation Act of March 4, 1927 (33 USCA § 901 et seq.), and is to recover damages for personal injuries alleged to have been caused by the negligence of officers on the steamship Seattle Spirit, owned by the United States.

The following constitute my findings of fact and my rulings of law in conformity with the requirements of Admiralty Rule 46½ (28 USCA § 723):

1. The steamship Seattle Spirit plied between Northern Atlantic ports and German ports. From September 26 to October 1, 1928, she was taking on a cargo at the Hoosac pier in Charlestown. On October 1 the longshoremen were engaged in loading hold No. 1 with lard in boxes which were being let down in a sling, 15 boxes at a time.

2. Weldon was working as stevedore in loading this cargo in No. 1 hold. He had worked in the hold until noon, when he ascended ladders leading to the deck. Just before 1 o'clock p. m. he started to descend into the hold, and on his way down he fell and sustained injuries to his feet and spine. The above are the only facts that can be said to be entirely beyond controversy. It also may be taken as facts not seriously disputed that the ladders involved were those at the forward end of the hold; that the ladders were in two sections, the upper section extending from the main deck to the 'tween deck, the lower section going from the 'tween deck to the bottom of the hold onto the tank top ceiling; that the ladders were of iron and were permanently fastened to the ship; that the upper ladder had 12 rungs about a foot apart, and the lower one had about 25 rungs.

There is no evidence to control libelee's evidence that these particular ladders had been installed about three years before the accident in compliance with harbor regulations of German ports, requiring two exits from each hold, and that the ladders had been inspected by, and had satisfied, the German authorities.

3. The first disputed question of fact relates to the condition of the ladder, especially the upper section, where, according to the libelant's theory, Weldon was when he lost his hold and fell. The officers testified that they examined the ladders (upper and lower sections) immediately following the accident. They found them free from defects, except that in the upper section one of the rungs, the third from the bottom, was bent out of line from 1″ to 1½″; that it was loose so that it could be turned around by use of the hands, if force enough was exerted. On the lower section they found one rung, about 12′ from the bottom of the hold, which consisted of a rod with a pipe over it, which was free to revolve because the nuts at the ends of the rods had become loose.

Libelant's witnesses, however, testify that in the upper section there was a rung which was made up of a rod with a pipe. They do not all agree as to just which rung it was, but they put it about the eighth from the top. I am disposed to accept the testimony of the ship's officers upon the condition of the ladders and the character of the defects therein. Their memory is refreshed by reports and charts made shortly after the event. These have the earmarks of honest representations of what was found. There was no attempt to conceal defects that actually existed at a time when it was not known what claim, if any, would be made respecting the cause of the fall.

The libelant's witnesses, who claim to have examined the ladders at the time of

the accident, all fellow employees, are obliged to rely, five years later, upon their unassisted recollection. It is significant that the only details upon which their memory serves them are those relating to the structure of the alleged defective rung. On other matters their recollections are either at variance with established facts or are entirely wanting. To strengthen this testimony, evidence of inspection, augmented by photo, made June, 1929, is offered. This evidence, if competent at all, is of little weight, since the photos fail to show the ladder with a bent rung and fail to show any rung constructed with rod and pipe. Either the ladder had been repaired during the nine months intervening or the ladder in question was not photographed. The photographs reveal evidence of renewal of a rung, set near one that had been removed. It is a fair inference that before June, 1929, the bent rung had been replaced, although none of the officers were able to recall any repairs other than tightening of the rungs as they worked loose. In any event, I cannot accept the photographs or the results of the inspection in 1929 as accurate pictures of conditions obtaining in October, 1928.

4. The next question of fact is whether the bent and loose rod was the cause of the fall. The only evidence on the question is the testimony of Weldon and Connolly, a stevedore, who was working with him. Connolly's testimony is utterly inconsistent with statements made by him at the time of the accident, when he stated that he was on the upper ladder, that Weldon was below him, and that he did not see what happened until he heard Weldon cry, when he looked down and saw him lying on the floor of the lower hold. This leaves the testimony of Weldon with little to support it, so far as it deals with the way the accident happened. He testified:

"A. I started down the ladder about one o'clock. I was down to about the eighth rung; I had a hold of the side of the ladder. I put my foot down on the rung and it flew around right quick, then the foot went, and the hands couldn't hold a grip so I went right off the ladder; it took me right off the ladder and I went right straight down and I landed on the two feet in the bottom of the hatch and I fell back.

"Q. Did you land on your feet? A. Yes, sir. * * *

"Q. How far would you say it was from where you feel down to the bottom of the hold? A. I would say about twenty-four or twenty-five feet from where I fell.

"Q. When you went down the ladder in the morning, did you notice anything wrong with the rung, or in coming up? A. I didn't notice anything."

■■ This statement is consistent with the claim of the libelant respecting the rod and pipe rung, but it is not so readily harmonized with conditions as they existed, according to my findings. It is hardly conceivable that the bent rung, even though loosened so that it was possible to turn it through a small arc, would have been an adequate cause for the fall. In any event, too much is left to speculation or conjecture to warrant a finding that the injury was due to that particular defect. The burden of proof is upon the libelant to establish that fact. The evidence, in my opinion, falls short of maintaining that burden.

But, if we assume that the imperfection in the ladder was a contributing cause to the fall, it does not follow that the libelant has established liability on the part of the respondent.

■ While the relationship of master and servant does not exst between the owners of the vessel and a stevedore employed by an independent contractor, nevertheless it is a recognized rule of law that the owners of the vessel, or those in charge, must exercise a reasonable degree of care in providing suitable and safe equipment for the use of the stevedores. The Rheola (C. C.) 19 F. 926; The Joseph B. Thomas (C. C. A.) 86 F. 658, 46 L. R. A. 58.

■ This duty arises, not from the contractual relations, but from implied obligation on the part of one who is to provide machinery for use by another, to exercise due care and diligence to see that the instrumentalities are safe and suitable for the purpose.

■ It has appeared in evidence, and I find, that none of the ship's officers, nor its crew, nor any of the stevedores, including Weldon, had noticed that the rung was out of line. The ladder had been built only three years before, had been inspected by the German authorities and approved, and had been inspected by the first officer just before loading began on September 26. Of course, a careless inspection would not exonerate the owners, but, if the defect was so slight that it had escaped the notice of those using it on the day of the accident, it could easily have eluded even a reasonably careful inspection. On the other hand, if the defect was easily discernible, it would log-

ically follow that the rung was bent by being hit as cargo was lowered into the hold while the loading was taking place, between September 26 and October 1. In such an event, the ship's owner would not be liable. It is not the duty of the owner to continually inspect the appliances used while the loading is taking place. Bryant v. Vestland (The Polarland) (C. C. A.) 52 F.(2d) 1078, 1931 A. M. C. 2006; Bryant v. Vestland, 1931 A. M. C. 1092.[1] In these cases it was held that notice of the defect occurring during the loading must be brought home to the steamship in order to impress it with liability. See, also, The Frank and Willie (D. C.) 45 F. 494.

In view of the foregoing, I find and rule that the libel should be dismissed, and it is so ordered.